Let's call the next case please. Case number 13-1654, Angel Marshall v. Evanston Skokie School District 65 All right, good morning. Would counselors who are going to be speaking to us today approach the podium and identify yourselves please? Good morning, Your Honor. Rosa Tumey-Allen for District 65. Good morning, Your Honor. Todd Smith on behalf of the appellant. Good morning. All right. And would the appellant like to reserve some time for his rebuttal? I would, Your Honor. Very good. You may proceed when you're ready. Thank you, Your Honor. May it please the Court, this case arises from the death of a Kwan Lewis, a 10-year-old boy who was found hanging from the back of his shirt collar on a hook inside a bathroom at the stall door at the Oakton School in Evanston, just several feet down the hall from his third-floor classroom. He was unconscious, given CPR, resuscitated sufficiently to be hospitalized for a day and died the following day. The timing there on that resuscitation and what happened with him I believe was relevant to some of the failures in this case. The trial court dismissed our First Amendment complaint and then our Second Amendment complaint against the school district utilizing various grounds. We included as part of our Second Amendment complaint exhibits five depositions, two expert affidavits, a group of police reports attached to what's called the Matthews Deposition or Exhibit C. I'd like to spend a minute or two just going through some facts that are within that listing of exhibits, and I'll do it briefly. Pages 11, 22, through 25 of the record that the Billups Deposition, a Kwan began having difficulties early in his fourth-grade year, just the year before, as a 9-year-old with difficulties that were of record to the school. According to the record, he had a number of issues in October and November of 2007. In that time period, he was listed as having difficulty recovering from anger episodes. This was known then by the school psychologist who was involved to be something that was a potential risk for self-harm. Could I just ask? Yes. Would you say that all four counts are now pled with the idea of a special duty? The first two counts were special duty. The second two counts were willful and wanton counts. Right. But are those also based on this idea of a special duty? No. No? No. Well, I think ultimately special duty does prevail here. I'm not sure if I'm completely understanding. Maybe I don't understand. But anyway, what you're telling us is that the first two counts are pled under this idea of a special duty, and the third and fourth are willful and wanton. Yes, and primarily the willful and wanton counts are there in order to address issues with regard to tort immunity, supervision and so on, which we say that is not applicable here. Essentially, Aquan was hospitalized during the end of that year, November, December, during his fourth grade year, and there was a letter sent to the school in December of that year after his hospitalization which told the school of his diagnoses for a number of things, ADHD, clinical depression, oppositional defiant disorder and suicidal ideation. They were told that he indicated he was and threatened to kill himself. That's all in the Phillips deposition, and then made part of the complaint by attachment as an exhibit. And the Terry Blake deposition, Exhibit A, all found on these facts, 1065 to 1080, if a child is reported to the school as having emotional or mental health issues, there would be a plan written up, and it's called a 504 plan. That plan is in the policies of the school. Is this part of the special duty, would you say? Yes. Because one is sort of abandoned in the other. Yes, it is. Let me ask you this. Now, the complaint has two theories as far as, you know, what happened to this young child. One is a possible suicide, but more probably true than not, it wasn't a suicide. Is that kind of what you're alleging? That's what we alleged, and we supplied an affidavit with respect to that from a medical examiner for the state of Georgia. Well, let me just, let's, okay. Let's talk about the possibility of the allegation that the school district being aware of all these things, is that leading up to the prevention of what would have been a suicide? It's leading up to the prevention of a child who couldn't intend suicide, is our contention, but could intend to lash out with respect to his threatening to kill himself. We are saying a child at that age could not intend suicide, but he may do things that puts him at risk for injury to himself. Risky games, the hanging game that we've talked about in the record. Or doing something to lash out at those who are disciplining. So is the suicide, are you saying that the complaint does not allege that a suicide took place? That's correct. Because suicide is different, and we tried to distinguish that with the affidavit talking about hanging was the cause. You're arguing that he harmed himself, but not committed suicide. What we're arguing. Or that he suffered harm. Yes, that he suffered harm, and it's related to his conditions. And in school they had specific personnel to deal with children that have conditions. Social worker, psychologist, a policy and plan to address situations where it's been reported to them. But this is all under the rubric of a special duty, correct? It's all under the rubric. Yes, a negligence case, and it becomes a negligence case because of the special duty doctrine exception. Okay, now the only, what would you compare this to as far as, I mean, at this point, the only cases that we have that have allowed the exception for the special duty relationship are those involving police and fire department personnel. Well, there's nowhere that that limitation is provided. That's true. It's a special duty as it relates to tort immunity for a local public entity is what it's about. What was the special duty vis-a-vis the school district based on the 2007 reports that there was a psychiatric history going on? I'm sorry. What is this duty regarding the knowledge that he had, I don't know, it's described as a suicidal ideation in 2007? There are requirements that are kicked off by the letter that they receive. That's acknowledged by Billups, the psychologist. It's acknowledged by Terry Blake, the health care clerk. She said that what should have happened at that point after they got the letter was setting up the 504 plan, dealing specifically with this child. Not the population of pupils, but focused specifically on him. But you agree, don't you, that educational malpractice does not exist as a tort in Illinois? I think the Wall case was the first case on that in 2012, if I understand. And that was narrow in terms of its focus. It was on instruction and training. That's not what we're talking about here. I'm just asking you, do you think this educational malpractice tort exists in Illinois? I think if you want to broadly talk about this as education, which we don't, we think this is simply negligence on the part of personnel who are in the education setting. But I think that case is about instruction and training. Let me go past this suggestion of an allegation of a special duty and then saying that they didn't react or omitted to act in response to this special duty. Let's get to the nub here. How is that, how do you plead that that approximately caused, the omission caused him to go into that bathroom and do whatever? We don't know what happened. I don't know that we'll ever know the tragedy that actually occurred. But how do you establish proximate cause that somehow these other things have something to do with conduct in the bathroom that day? His whole makeup was such with this suicidal ideation, with the ADHD, all of the diagnoses that he had. Yes. He is supposed to be addressed with regard to his mental illness precisely on those issues. Suicidal ideation. And what happens when he doesn't get addressed for those issues in a care plan? He goes on to have, and then he gets to. Let me answer the question, Mr. Judge. What is the allegation that, did a doctor opine, did someone opine that because they didn't do this, that he committed, or that what happened to him was the result? That's what I'm asking. Where is it pled that this act, or if it's an omission, failure to do it, what do we know, how do we know, what are the facts to tell us that these acts or omissions resulted in what occurred later? Before we get into that, before we get into that, do we need to have doctors opine on complaints and motions to dismiss? No. No, we don't. So why do we even talk about what we don't need? I respectfully would agree with that. The point is we're at a 2015 rating. Isn't this just a case, to make it simple, this is a case where somebody either through a game or through suicide was hung in a bathroom on a hook. Isn't that what happened here? That's right. Okay. And there was information that this child had some mental problems which wasn't disseminated to the teachers. Wasn't disseminated to the teachers. He wasn't given the plan required by law and policies. And if that information was given to the teachers, they would have watched for him when he was missing. In the natural course of events, that would be the purpose of doing that. So this child is cared for. Yes. Yes, and it's all attached in the exhibits. Well, I'm not. We just said we're not looking at exhibits. Now, where is the allegation that because they didn't have a plan from the information of 2007, that that approximately caused what occurred in the boys' bathroom that day? In each and every count, we allege that all of this resulted in, with a proximate result of the aforesaid, resulted in his injury and death. We've pled that. And we're at that 2-6-15 stage. But you can't do that by a conclusion. Well, we did it with all the facts, though. The natural course of events, if they don't supply him with the safety net by policy he's supposed to have, he's supposed to be given that in order for this purpose just to protect him. But they're supposed to be, they're on notice that he might have suicidal tendencies, and they're supposed to protect him from committing suicide. But you're telling us now that he didn't commit suicide, that he played a game. So what's the causal, what's the nexus between his mental health issues and this game that ultimately killed him? What we're saying about suicide is that he may well go through the acts of what results in all of us thinking that's a suicide, but a child can't formulate that intent. He talks about, I'm going to kill myself. He doesn't even know what that means at that point. That's the reason we have that. But that doesn't answer my question. My question is, so if we're putting suicide as, if we accept that, that this child was not of an age that he could form suicidal intent, we put suicide aside and we say this was a game that went awry, what's the causal connection between his suicidal tendencies and playing this game? That he's a risk taker? That he's involved in dangerous activity? That he will put himself at risk in this way? Was that part of what they were told, that you've got to watch out because he takes risks? She acknowledged that in her testimony. She acknowledged that the kinds of things that he, his inability to handle his anger, and that's elements as well that you'll see on the very day this happened. What does the inability to handle anger have to do with playing a game? Because he then lashes out. Was this an angry game? That's what I'm saying. With respect, I would say with respect to what his conduct may be as he leaves that angry setting. In other words, he's going to lash out at those who are involved in handling him the way really he shouldn't be handled because of the issues that he has. We're at a pleading stage. No, I grant you that. The question is if at the end of the day we're not saying this is a suicide, we're not saying it's a hanging game, we really don't know what happened. How do you connect any of this to what happened? That's what I'm asking for. How do you connect that the acts or the omissions somehow approximately caused what occurred that day? I believe this child may well have gone in and done something to lash back at those involved. He would say things like, I'm going to kill myself. Okay, now that's something that's also missing from the complaint. There's an actual allegation that he suffered from suicidal ideation in 2007. However, I don't know exactly what the suicidal ideation is because it's not outlined. But the fact of the matter is there's never a statement in this complaint that he said, I'm going to kill myself back in 2007. Is there? It's within the Billups' deposition. The Bajwa case of our Supreme Court says that the exhibits attach. So when did he say that, I'm going to kill myself? He said that, and what I'm saying is that he said it leading into the hospitalization in the end of 2007. Yes, he was capable of doing that is what we're saying. So then he was supposed to get worked up with respect to these things by the school, outside folks as well, but by the school. Was the school aware or on notice of a hanging game? Is there anything in here that's pled that they knew or should have known that there were children in the school that were going into the bathroom and playing the game or something? No, our point in raising that is that there were games that children did play, and that was another possibility or potential as to how this may have happened to him. Well, then how is the nexus between the failure to act or to act? Because if he gets the care plan that he's supposed to get, then they're going to be observing him and dealing with him separately in light of what elements of all that I've talked about that he has. That's what they would do. They'd watch him. Are you saying that you should be allowed to amend to say that since he was in school and he had some kind of a history from about, I don't know, a year and a half before, that he should have been on a 24-hour watch or 8-hour watch or 6-hour watch? No. But when he's in that school, when he's in that school, the policy says he's entitled to that 504 and the IEP, these care provisions that are supposed to be the safety net for him. They believe that it's a suicide. Even if this court were to say it was a suicide. We're not going to say it's a suicide. I don't know what it was. It's a tragic event. Are you saying it was definitely not a suicide? I'm saying we can't tell for sure, and we've relied on cases that I think have. Aren't you saying that it's maybe two things? Maybe it's a suicide. Maybe it's the hanging game. Essentially, yes. Essentially, yes. We cited Illinois Central v. Seiler in longstanding proposition, still good law, in order for a negligent act to be an approximate cause of an injury. It's not necessary that it be the particular injury and particular manner of its occurrence. He's found hanging, which may well be something he did with himself, but we can't form that intent. What you're saying is it doesn't really matter whether it was a suicide or whether it was a hanging game because regardless of what it was, it was a tragic event and they should have been watching him more closely. That's right, but they should have done the care plan. It's not necessarily supervision and watching, but it's whatever the care plan is. They don't discipline him the way they did that day. He had three warnings already that day. The teacher may well, if they'd given us the plan they were requiring him, may well be treating him differently. Weren't the three warnings for talking in class? Isn't that what all your exhibits show? The teacher who had him said he had a yellow card that day. He was talking too much. There's no way the parents would have ever been called. And the next step is like a red card. And even then it's questionable whether a parent would be called about a red card. I mean, these aren't things that would be in the record. That's what he said at deposition. What he told the police, which is part of his deposition as exhibits, is a bit different. He talked about he was that close, basically, going down to the principal's office again. The day before, he had served a suspension because on Friday, this was a Monday was the day before, he served a suspension. On Friday, in the police reports, attached to part of the complaint through the exhibits, is that he had thrown things off the teacher's desk after the teacher had called his mother about problems that day. And so there's a lot more going on there, and this teacher isn't even made aware. His responses that we ever made aware were, absolutely not. And he even responded, had he known, he may well have done things differently. That's the essence of the testimony. The point here is, really, if they do what they're required to do by policy, specifically on mental illness, look at the Blake testimony on this. It is a wow moment, in my opinion, as to what the underlying facts were as to what they were supposed to do. She ultimately said, he fell through the cracks of what we're supposed to be doing. You know what bothers me here? I'm going to tell you what bothers me about this entire thing. What you're arguing and what my panel members are asking you questions goes to the proof of the matter. You only have to plead a cause of action. You don't have to prove it at this stage. And the question is, did you plead a cause of action? Not whether you proved it. You may never be able to prove this case in a million years on a summary judgment. But this is a pleading situation. I'm afraid I couldn't agree more. The point being, that's where we are. Will we put on experts some day to finish up these issues? Absolutely. But that's not the point where we are. But the reason we put the deposition transcripts in there is we sensed we had to do that. We weren't given an opportunity to respond either written or orally on this motion on the Second Amendment. It was deemed unnecessary. We knew this was coming. So we attached all of these exhibits so you could have this as the factual underpinnings for what happened. We didn't get to present it in a motion response. And we didn't get to present it in an oral response to the court in terms of what was happening. We had a pleading. And we tied all these facts in there in order to substantiate the claim. This is foreseeable. They were told about it. They were told that this child had major issues, suicidal ideation. And he's found hanging in their bathroom. He's been missing in action for over 30 minutes. Is there a requirement that the parent give some consent regarding the release of the information? She gave it. Are there two different types of consent? Well, the one I recall was given was for the records. Ms. Billups acknowledged it. And I believe Ms. Blake acknowledged it. In fact, Ms. Blake acknowledged it and said, yes, that covers it. That's what you're talking about.  They were able to call the psychiatrist's office. There was a conversation with Ms. McCarthy. We've identified in the exhibits as well in terms of finding out more about him. And then it just disappeared. Nothing happened. No plan was given. That was supposed to be the safety net that handles this child in a stressful situation at school. And then they want to say, just on a quick proximate pause point, they say it's suicide, but in some way it's unrelated to the mental illness issues and everything that he had. They've been reported, but they say it's suicide. The reason they say it, of course, is they believe that that will get them completely off. Well, you're saying that it's his death. It doesn't matter whether it was suicide or something else. Ultimately, the proximate pause. You're saying that the death was caused by their failure to act. To provide him with the care, the policy they were to provide. They didn't act, and therefore, because they didn't act, his death was partially caused by that. Yes, their failure to provide that safety net that is there. I'd like to just comment quickly on 2201, these immunities. 2201, we're not talking about the exercise of discretion. The Heranek case of our Supreme Court is not, curiously, included in their papers, and I can understand why. That the act or omission must be both a determination of policy and an exercise of discretion. That was a fire commissioner who determined the policy and then exercised the discretion as well. We're not focused on anyone who's determining policy. What we're focused on is people who are supposed to follow policy. They failed to follow the policy already in existence. The personnel in the office, and as a result, by a prescribed manner, even the defense brief at page 21, a ministerial duty is to follow something in a prescribed manner. That's exactly what we're talking about, and it's exactly why healthcare person Blake said he fell through the cracks of our procedures. In the duty analysis, do we look at foreseeability? Yes. All right. So are you also saying that because of what they failed to do, it's more what they failed to do than anything they affirmatively did. Isn't that right? Well, I think they affirmatively dropped what they've been doing. So I think that that happened. I think they are working on – Well, I suppose you can say it that way or you can say they failed to act. But at some point – They failed to continue, I guess. They failed to act. Based on their failure to act, it was foreseeable that he would die. Yes, a proximate cause of that, yes, that he would do something just like they were told he may do. I'd like to point out, Mr. Smith, in a minute I'm going to have to cut you off. We are going to hear from you again. Did you ask for a leave to file another amended complainant? She denied it in the motion, in her order, with prejudice. So we were not provided that opportunity. She said we would fail to be able to pledge. This was your third complaint? This was our second amended. First, yes. So that was your third complaint then, correct? Yes, it would have been. Yes, that's correct. All right. That's correct, yes. The Heredia case stands for the proposition that you need both policy and discretion. They can't get to that standard. 3108 doesn't apply here. We're not talking about a supervision of an activity. We're talking about failing to follow policy, provide the protection he was supposed to have and didn't get. And as a result of that, he gets to the point where he does something quite in line with what they were warned about and were supposed to provide care for. We're going to hear from you again in a few minutes. May it please the Court, Counsel. Again, my name is Rosa Tumial, and I'm here for Defendant Eppley. Judge Tumin, I think that you summarized this case appropriately. This is an awkward position to be in, to be arguing proofs at the pleading stage. And we, in fact, pointed that out in our opening brief that this sounded more like, and drafting that brief and preparing for argument feels more like a motion for summary judgment as opposed to a motion to dismiss, albeit a combined motion that goes beyond the pleadings, but yet a motion to dismiss nonetheless. Part of that awkwardness really is the fact that instead of pleading facts with a third chance, the third attempt that was granted to plaintiff to plead a case, they threw their hands up in the air and just attached all the depositions taken under the guise of a respondent discovery procedure to then have the trial court pick the facts that would then support the claim. I heard counsel say that they felt that they were required to do that or they felt compelled to do that because of the manner in which the Second Amendment complaint was disposed of by the trial court. However, counsel did not know going into the second briefing on the second motion, or motion to dismiss the Second Amendment complaint, that the court would not hear argument. They did this knowing how, why their First Amendment complaint was dismissed. And that was a very detailed memorandum ordered opinion that was offered by the trial court, very thoughtful analysis that pointed out every single defect. And every single defect that was in that First Amendment complaint remains in the Second Amendment complaint. The only real difference is the fact that now there are 700 pages of deposition testimony that the trial court and opposing counsel was required to call through and then identify why that still failed to state a cause of action. There's cases in this district. Well, they might have been able to help the trial court if they were allowed to file a response. Well, they could have helped themselves by pleading a complaint with facts, which is if they took on a step. In terms of calling through the depositions. Instead of forcing opposing counsel and the trial court to call through the deposition testimony, they could have called through the deposition testimony themselves, identified the salient facts that would answer the questions that Judge McBride was posing this morning about proximate causation, foreseeability, and actually stating the facts that are now being. Well, let me ask you this. We were just told that the school district was warned about something. Now, what exactly, since, you know, you have and opposing counsel have the benefit of all these whatever, depositions, whatever there is, anything. What were they told about the suicidal ideation in 2007? In 2007, Judge, the deposition testimony reflects that the district received a letter from an outside provider. And that letter was received in late January 2008. And they were told of the hospitalization or the care. And what the deposition testimony shows, that District 65 actually did something. They followed up. Was that a medical letter? Excuse me? Was that a medical? It was a letter from the outside treating physician. So that's a medical letter. What did it say? What was he in the hospital for? What happened? What did he do? What did he say? What? It was just a letter advising the district that he had been hospitalized for depression and suicidal ideations. And then that prompted. ADHD? Yeah, ADHD was in there. ADHD? Yeah. Okay. So what that did, though, Judge, was that allowed the district to then follow up, which is what they do. The testimony was that Ms. Phillips testified that she then reached out to the mother, received the consent to then talk to that provider, spoke to that provider, spoke with the teachers, and then determined that the child was receiving sufficient care outside of the school and presented no danger to himself in the school. She's not positioned to make medical diagnoses, but what she did was within her role as the school psychologist, she made these determinations and actually did follow up with the teachers. Now, counsel will, I'm sure, mention that nobody disclosed the actual diagnosis. Of course not. There was no consent given for that. There was the consent given for the psychologist to speak to the outside treating physician, but there was no other consent given to start disseminating diagnoses made by that physician, even though the consent was given for the psychologist to speak to that person to just find out what was going on. Again, information that the psychologist said that that's what she does, and then the course of the proceedings, that's what the school did. The school did not sit by and drop anything or let anything go by without any further follow up. What counsel refers to as a falling through the cracks, again, is just cherry-picked testimony that is in the deposition, however, taken out of context, and when you read the full, complete deposition, that testimony actually conflicts with later testimony, which then, of course, conflicts with the allegations in the complaint, and as we know, and as counsel just mentioned, the Bajau Court says the allegations that are contrary to the facts in the exhibit, the exhibit controls. Let me tell you what bothers me about this case. The plaintiff may never be able to prove a case here, but this is the pleading stage. This isn't a motion for a summary judgment, and he only has to plead a case. He doesn't have to prove a case, and we seem to all are trying to get into proof here instead of alleging. I mean, there are judges who believe that you have to prove a case instead of plead a case, but that's not what the law says, and that's what bothers me about this case. This is one of those cases where everybody is getting on the wrong bandwagon. Did you file a motion under 2615? Did you file a joint 2619? It was a combined, 619.1. What did you challenge? We challenged everything, Your Honor. So on 615, we challenged the lack of proximate cause to support the negligence allegations. We challenged the fact that there was no facts to support the willful and wanton counts. Are the willful and wanton counts virtually identical to the counts one and two? They are not, Your Honor. Counts one and two only allege two omissions, which in our opinion are conclusory allegations, and then counts three and four have more detailed, not necessarily more detailed, but just a longer litany of what was actually what was the failure, and those involved the failure to notice that he was missing for more than 30 minutes. In legal terms, what you challenged was that the plaintiff did not state a cause of action. Correct. Isn't that correct? That's correct. That's how simple it is, and the question is he has to plead a cause of action, nothing more, nothing less than a cause of action. That's right, Judge, and the only reason why we're having this discussion about the depositions is because now they've been made part of the pleadings. I understand that. And how many times did the trial judge say that the plaintiff did not plead duty or proximate cause? Three times. Okay. So she simplified this herself, too. She did. She said that there was not a cause of action under these facts as alleged in this particular complaint. Exactly, and then she also said on dismissing the second amendment, she said even despite the addition of all these deposition testimonies and exhibits, which we have affidavits and curriculum CVs that are attached, that are awkward to be attached to a pleading, but nonetheless, there they are. She said that even despite those, there's still no cause of action alleged, because why? There's no proximate cause. Judge McBride, you asked, and I don't think I ever heard a direct answer, what was, how do you, asking counsel, how do you connect the acts or omissions to what caused the events of that day? Well, this just said that whatever occurred, the injuries that occurred to this child were the result of the acts or omissions that the Evanston-Skokie School District either didn't do or did do wantonly. Right, and what they specifically said was that they failed to alert the child's fourth and fifth grade teachers about his mental health history, and they ignored the specific danger of harm which existed. Those are conclusory allegations. What's, let's just take the first one. I think that since, you know, this thing got so enormous in the trial court with all these depositions, there's something certainly in this record where one of these, his actual teacher said he wasn't told about any of this. Isn't that in there? That's in there, that he wasn't told. Okay, so I mean, they say that in the complaint. They say that he wasn't advised of his condition. So I don't know, you can say that's a conclusion, but actually, I mean, I think we can pull some facts out of that. I think that's a factual statement that they didn't tell his fifth grade teacher. I think his name was Mr. Matthews, wasn't it? Yes, it was. Okay. He did say in the deposition that he wasn't told about, you know, this history from 2007. Right, but the failure to alert goes to this failure to implement this 504 plan and the IEP, but then we're talking about an educational malpractice claim, which is not recognized in the state of Illinois, and then even if you were to accept. Well, I don't think that Mr. Smith agrees with you that that's not necessarily the case. I know he doesn't. However, here's what he didn't do. He didn't replead that in his second amended complaint. The express allegation of the failure to implement the IEP plan or the 504 plan was actually alleged in the first amended complaint. It is conspicuously absent in the second amended complaint. How they address that? Their response is, well, we have attached all these depositions. Well, that brings us back to what Judge Borden is talking about, that there are cases for the appellate context, that an appellate court is not a repository on which you voice the burden of argument and research. Well, a trial court is similarly not that repository where you've voiced on them the burden of finding out if you pled a complaint. Why does a trial court have to go through 700 pages of deposition testimony that the plaintiff took under the premise that they needed to take this respondent and discover it because they had to find out who else could be possibly a defendant in this case. They did it in reaction to a motion to dismiss the original complaint. Then they amended their complaint. They filed a first amended complaint with the benefit of some of that testimony. Still didn't pass muster. So then what did they do? They filed basically the same complaint. They just attach all the deposition testimony. Well, I think their complaint, the second amended complaint, is more appropriately described as a special duty. They say that because this child had a previous history from 2007, that his mental health history was such that they should have taken certain actions to make sure he was safe. So by failing to alert the fifth grade teacher about this history from 2007, that because of that breach that this caused this harm, which we're not sure how it actually took place. But they also say in their complaint that they ignored a special danger of harm for this particular student when it became aware of his unique mental health history. And by not doing anything or failing to do something, that that conduct caused what happened. But I'm not sure what did happen. Right. And no one's going to know what happened. But he was harmed because obviously the young boy is dead. The special duty doctrine does not apply here because the elements that are required for that doctrine to apply are not satisfied. You need a unique awareness of a particular danger to this plaintiff. You need specific acts or omissions that are willful or affirmative in nature. You need to have the defendant has to create or, excuse me, has to have direct control over the plaintiff at the time of the injury. We don't have that here. We have no unique awareness of a particular danger to this defendant. What we have, the only facts alleged, are that in 2007 the child was hospitalized. The school found out about it in January 2008, more than a year before the incident, and they followed up with the appropriate personnel, determined that there was no danger posed to the child to himself at school, and that he was receiving adequate treatment outside of school, and they proceeded accordingly. Well, aren't you kind of talking about questions of that now? Should a trial court give another chance to amend? Should it ever dismiss a complaint without a response or reply from the other side? At a pleading stage like this, involving a rather unique factual situation, I don't know that we could compare this to any other case that we've seen. Well, I would hesitate to comment on how a court would control his or her own docket. Well, I mean, both of you have been standing up here telling us about all these things that, you know. I mean, could there never be a set of facts that would bring a cause of action here? No, not here, no, Judge, because a special duty really doesn't apply in these contexts. It's very limited. It's a very narrow doctrine, and as was recognized earlier, this was something that has historically been limited to the first responder type of personnel, because those are the people that could arguably have the situations where these elements would come into play. But we're talking about a child who the allegation is that he needed a 504 plan. Well, there's no allegations, there's no fact allegations that he actually qualified for the plan, that it was requested and not provided. Well, then maybe they should be allowed to amend it. Well, you know, the problem here is this. You know, if you have a child who has a mental problem and you tell the teachers, they will watch the child more carefully, and if they watch the child more carefully, it may prevent this type of thing from happening. So there could be a set of facts that would create a cause of action. But then we're talking about supervision, and that triggers 3-108 immunity, because we're talking about the movement of the child within the school, and that is subject to that immunity. We're also talking about 2-108. Well, wouldn't that be more of a subject for a summary judgment than a pleading? You know, as I said from the beginning, they may never be able to prove a case, and you may be 100 percent right. But the question is, this is at the pleading stage. Do we knock these things out at the pleading stage? Because there could be a cause of action. Almost always there could be a cause of action. Well, the problem, Judge, with this case is that the plaintiffs were on notice from the dismissal of their first, the original complaint. So this was the third try. But they were on notice from basically minute one when the first complaint was dismissed what the actual defects were. Well, should we write a decision and say that after you've had three tries no more? I mean, is that what the law should be? No. What it should be is it should be that when the record has been developed, as it has been here, that it's clear that the defects were never addressed, were not corrected. What specifically do you think the defects are? There's no causal nexus between what was alleged to not have been done by the district and the event. And we don't know what the event is, but the event is characterized in several different fashions.  And more likely than not, it's not a suicide, according to the plaintiff in the allegations of the complaint. But if you're saying that it's a failure to provide the IEP plan, well, the testimony that's attached to the complaint, which controls, says that they made the decision that one was not needed. So there's no failure. But you used under 2619.1. Yes. So you also argued that didn't you suggest to the court that some of these issues could be disposed of like a summary judgment motion? Well, on the 619 version, yes. Because that was the, those were the immunity allegations. So is the immunity going to, is the immunity, are you saying that the immunity is going to preclude, not 9 to 5, but 8 to 4 supervision over every child in every school at all times? Under the facts of this case? Yes. Yes. So that the immunity is going to throw out the idea that any school, there is no school that can watch and monitor everything. Like when kids have to go to the bathroom. Is that what you're saying? Yes, that's correct, Judge. In fact, there's that recent case that we sought leave to cite as additional authority issued by the 4th District. A similar situation, we're talking about a game in a bathroom that involved punching, students punching each other in the abdomen. One child was hit very hard apparently and then died as a result of the injury sustained. The school didn't have any notice of that event, that game. How could they have prevented it? There was no way that they knew about that. Similarly here, there are no allegations that the school was aware of this hanging game, which is actually a misnomer because it was a pull-up game. They would be hanging on the crossbar and pulling themselves up and then the door would be behind them of the door of the stall. But in any event, the point is nobody knew about that. Nobody in a position of authority at the school was aware of that game until after. I don't know that this complaint has really bottomed down the idea about some game that went wrong as opposed to the death that resulted from something that took place in that laboratory. This is a little different than that 4th District case because we're talking about a case involving a history of mental health issues. But I don't know, like I said, I don't know about mental health issues other than one from 2007 that's alleged here. The other thing too is, Judge, to the extent that there's a failure to disseminate the information, which is the other allegation or the other claim that that's the proximate causation or that's the tool that causes the event, the failure to disseminate, counsel himself said, if there had been dissemination of this information, which of course is belied by some of the deposition testimony, but assuming what he's saying is true and that nothing was disseminated, if it was, it would have led to greater supervision. Well, that again triggers the immunity because we're talking about supervision of the child within the school. This is nothing more than an attempt to package and repackage what is a nonviable claim. It's certainly a tragedy. Should the immunity issues be decided on a motion to dismiss? When the facts support them as a matter of law, yes, they can be. They can, when the facts support them as a matter of law. But generally speaking, that's not what takes place. I mean, like Justice Gordon pointed out, maybe on a summary judgment motion this case will never go any further, but traditionally you're not seeing motions to dismiss based on immunity under 2619 and that being something that's done routinely. Well, I wouldn't say routinely, Judge, but it's not infrequently either. There are cases that are certainly disposed of at the pleading stage where the facts alleged don't show the causal nexus that is required to support a claim. Or in this case, for purposes of immunities, the facts alleged plainly involve conduct that is immune. Here we're talking about the discretionary immunity. The decision not to implement or the decision to find that the child did not need additional services, that's a discretion. There's no allegation that there was a requirement that the 504 or the IEP be implemented. So once, as the deposition testimony makes clear, once it was decided to determine that there was no need for that, that's a discretionary act, and that's subject to the immunity. With respect to the supervision, this whole claim is based on a failure to supervise the child. The failure to disseminate means it didn't have additional supervision over the child. This game, whatever role the game played, failure to prevent the game from going on or nobody, that's, again, supervising the children within the school and their movements within the school. The teacher's failure to notice the child not in line when he went to PE class, failure to supervise again. We always come back to conduct that is subject to an immunity, even if you were to get past the 615 argument and find that there would be or could be a cause of action stated. There is simply nothing that has been provided here by the plaintiff that warrants reversal of the trial court's recent judgment that the complaint fails to state a claim and was properly dismissed with prejudice. Thank you, counsel. That doesn't be affirmed. Thank you. Briefly, Mr. Smith. To the point of the stage of the proceedings we're at, we had a conclusion reached here that this was a suicide as a matter of law, and we pled to the contrary. That's what happened there. They said in their brief that the county medical examiner declared it a suicide. That's not part of our pleadings and not a 2615 issue. They said also that our expert had said that, which is completely not true. Forget about the suicide. I still am trying to connect. His death was the proximate result of an act or omission. Wouldn't that have been supervising him at every moment? It wouldn't be because we never got there. The plan didn't necessarily amount to supervising an activity. I'm talking about the failure of a plan. How did the failure of a plan proximately cause his death? We're not calling it a suicide. We're not calling it by a hanging game, because really I don't think anyone here has any idea what happened. So my question going back to you is this. I'm not talking about immunities now. What I'm talking about is how do you plead that the failure to act caused even a cause of what happened in the boy's laboratory? Well, on proximate cause, it need not be the last or nearest. So somebody might have done something to that boy because he was not being taken care of under a plan at that point. But at 07, early 08, they're supposed to do something dealing directly with the idea that he has these issues and that he may do something to harm himself. And they don't do it. And what happens is it happens. There's safety net they were supposed to create then, and ultimately he's dead through something that looks like it may be suicide. They didn't do anything about it when they were supposed to. Isn't that educational malpractice? It's not. It's not. It's nothing to do with education. He's not being educated with that. This is an instruction in training. So it's supervision. It's supervision then. It's not supervision. Then what is it? If it's not supervision, what is it? They don't get the blanket of supervising. Isn't it a failure to watch? It's a failure to protect and care, the winger court that we cited. Isn't that a supervision that the school has a duty to watch him at all times? Well, I think they probably do. But what we're claiming is they failed to do that,  Do you think there is such a duty in Illinois? Is there a duty in Illinois to supervise at all times when a child is in school? There is. All right. There is. But if you're talking about 3108, it's supervision of an activity. And are we to call everything about this boy in terms of the issues he had to be an activity? Those are sporting events. There may be rides on a bus. Those kinds of things. Then are we getting into the immunities that are important to schools? But you still are entitled to a willful and wanton claim under that. It's not a complete immunity even on that issue of supervising the activity. All right. Well, then, do we have willful and wanton conduct? I would get to that. Yeah. I'm sorry. How about this? If the teacher, Mr. Matthews, was told of the problems of this child and the child took a recess to go to the washroom and he didn't come back in two minutes, then Mr. Matthews may have a reason to go check and find out why he's not back in two minutes. Absolutely. And we plead this in our willful and wanton counts as well. And it's in the depositions. But the trial court, Your Honor, Justice McBride, you asked the question, are the willful and wanton counts the same as the negligence count, which is what the trial judge actually said, which is wrong. Our counts were different. There are some that are similar, but that was simply wrong. Paragraph 34 describes exactly what's being talked about here by Justice Gordon. It describes Teacher Matthews having knowledge that Equan was last seen at about 2.15, and it must have been about 2.45. He then walks the other children down two floors to a gymnasium, and he's been missing now for over 30 minutes. What does he do instead of doing as you would suggest? Where's Equan, my boy, that's got special issues that I know has got problems? Where is he? He's been gone. What he does is he goes to the office and checks his mail. I don't want to get into the time frames, but your complaint says that at 2.40 he started getting to class in order to go to gym, and that he left, and before 3 o'clock, there had already been a 911 call. Yes, shortly before 3 he's found in a 911 call. So what I'm saying is 2.40 he lines him up on the third floor. It takes time to get him down to the gymnasium, and when he's returning and he stops at the second floor office, what he does is he goes in and checks his mail, and he knows he's got a child that's missing. He originally denied that to the police. That's part of the exhibits as well. He denies it to the police, and at deposition he retracts because he knows he was seen in the office. I mean, these are all part of stuff we had to put in the exhibits for this pleading, and Bajwa, by the way, they're wrong about Bajwa. Bajwa exhibits only control. I don't think there's much problem with the exhibits from our perspective, but they only control when they are instruments, and the court specifically says that. If they read a page further, they would have seen that. Real quickly on special duty that the court had been asking about, three elements. Unique awareness. They couldn't have been more uniquely aware that this child had these issues. We've pled it. It's all in all of the discussion of both Billups and Blake with respect to what they were aware of. They had policies in place for this. We identified, secondly, the next point that they should have had an IEP. They didn't do that. They should have had a 504. They didn't do that. Those are what those allegations amount to, and it's all in the discussion in Billups and the other witness. And thirdly, the final one is control. They said, well, it's not enough just to be in a school and there to be control. Well, there's a lot more control going on with this child, or should have been, because he's been separated out from the general population by virtue of the information they had. They've identified him. They're in complete control of him in the setting of a school every day. School plus information about him. They've got a psychologist involved, a social worker that's supposed to be involved, and that's the kind of control they had. This is special duty. It's one of those kinds of cases. They don't happen that often, I understand. But those elements are all met. I appreciate the Court's attention, and at that point, unless there's additional questions, I'll sit down. Thank you, Counsel. Thank you. Thank you for your excellent presentations, Counsel. We'll take the matter under revisal.